DAVID R. PAOLI
**PAOLI LAW FIRM, P.C.**
257 W. Front St., Suite A
P.O. Box 8131
Missoula, Montana 59802
Telephone: (406) 542-3330
DavidPaoli@paoli-law.com

*Attorneys for Plaintiff and the Class*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| **SANTISHA BRYANT-BOOKER,** individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **SNOWFLAKE, INC.,** <br><br> Defendant. | Case No. _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Santisha Bryant-Booker ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Snowflake, Inc. ("Snowflake" or "Defendant"). The following allegations are based on Plaintiff's knowledge, investigations of counsel, facts of public record, and information and belief.

## NATURE OF THE ACTION

1.     Plaintiff seeks to hold Snowflake responsible for the injuries Snowflake inflicted on Plaintiff and millions of similarly situated persons ("Class Members") due to

Snowflake's impermissibly inadequate data security practices, which caused the personal information of Plaintiff and those similarly situated to be exfiltrated by unauthorized access by cybercriminals (the "Data Breach" or "Breach") beginning sometime in April 2024.

2.    Defendant Snowflake provides digital warehouses, known as "Snowflake Data Clouds," for its thousands of clients around the world, and as a result has access to, stores, and maintains huge datasets of Private Information of its corporate clients' customers and employees. For the purposes of this action, Snowflake's corporate clients are entities that contracted with Snowflake to store confidential files of their customers and employees. Snowflake's corporate clients include, but are not limited to, AT&T, Ticketmaster, Mastercard, Nielsen, Novartis, PepsiCo, Siemens, Advanced Auto Parts, Santander Bank, Allstate Insurance, Anheuser-Busch, Mitsubishi, Neiman Marcus, Doordash, HP, Instacart, Capital One, JetBlue, Pitney Bowes, Progressive, State Farm, NBC Universal, and many others.[1]

3.    Snowflake's corporate clients paid a fee to Snowflake for Snowflake's data cloud storage and services. The fee was, at least in part, paid to maintain security features surrounding Snowflake's data storage. As a result, Snowflake was required to secure its cloud storage systems, on which its corporate clients stored sensitive information and files containing Private Information of millions of individuals –their customers and employees (the affected Plaintiff and Class Members).  Unfortunately for Plaintiff and Class Members, Snowflake did not.

---

[1] See, Leaders Choose Snowflake, SNOWFLAKE (N.D.), https://www.snowflake.com/en/customers/all-customers/ (last visited July 20, 2024).

4.      The data exfiltrated through the Data Breach is highly sensitive, and included personally identifiable information ("**PII**") including but not limited to individuals' full names, address, email address, and Social Security numbers, as well as other sensitive information like auto insurance information, credit card numbers and purchase histories, and online tracking information, including but not limited to pixel tracking data, device IP addresses, and other sensitive information.  Throughout this Complaint, the information exfiltrated is collectively referred to as "**Private Information**."

5.      According to an investigation and report from Google-owned cybersecurity firm Mandiant, the threat campaign was orchestrated by the uncharacterized threat actor group "UNC5537."   Mandiant's investigation revealed that approximately 165 of Snowflake's corporate clients' customers' and employees' sensitive information has already been exposed and misused as a result of the Data Breach.[2]

6.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect the Private Information exfiltrated.  Snowflake could have easily prevented the Data Breach by requiring all users to use multi-factor authentication, allowing the companies that store information on its data cloud services to enforce multi-factor authentication ("MFA") for the users, requiring all accounts to regularly update their passwords (as any reasonably prudent cloud service provider would in this industry), monitor suspicious activities on its data clouds, implementing protocols for detection of unusual activities associated with

---

[2] UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion, MANDIANT (June 10, 2024), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion. (last visited July 20, 2024)

unauthorized access, limiting access to its networks/cloud services to only necessary users, monitor infostealer marketplaces for compromised credentials, preventing access to the platforms/clouds from suspicious accounts, and following the basic industry standards for maintaining reasonable security measures of its cloud. Had even some of these basic features been enabled (such as allowing administrator enforcement, i.e. that Snowflake's corporate clients themselves require MFA access to their respective Data Clouds), this Data Breach would have been prevented.

7.    Indeed, Mandiant's investigation found that the threat campaign was successful because "the impacted accounts were not configured with multi-factor authentication enabled, meaning successful authentication only required a valid username and password." In other words, had Snowflake enabled multi-factor authentication for all users of its databases, this Data Breach would have been prevented.  As detailed later, Snowflake could also have prevented the Data Breach from occurring in several other ways.

8.    Upon information and belief, prior to and through the date of the Data Breach, Snowflake obtained Plaintiff's and Class Members' Private Information and then maintained that sensitive data in a negligent and/or reckless manner. As evidenced by the Data Breach, Snowflake inadequately maintained its network, platform, software, and technology partners—rendering these easy prey for cybercriminals.

9.    Upon information and belief, the risk of the Data Breach was known to Snowflake. Thus, Snowflake was on notice that its inadequate data security created a heightened risk of exfiltration, compromise, and theft.

10.     Despite this, Snowflake allowed the Data Breach to occur, and then compounded the harm by failing to detect it in a timely manner.

11.     Moreover, even after learning of the Data Breach, Snowflake failed to provide timely notice to the affected Plaintiff and Class Members—thereby exacerbating their injuries. Ultimately, Snowflake deprived Plaintiff and Class Members of the chance to take speedy measures to protect themselves and mitigate harm. Simply put, Snowflake impermissibly left Plaintiff and Class Members in the dark—thereby causing their injuries to fester and the damage to spread.

12.     Today, the identities of Plaintiff and Class Members are in jeopardy—all because of Snowflake' negligence. Plaintiff and Class Members now suffer from a heightened and imminent risk of fraud and identity theft and must now constantly monitor their financial accounts.

13.     Armed with the Private Information stolen in the Data Breach, criminals can commit a litany of crimes. Specifically, criminals can now open new financial accounts in Class Members' names, take out loans using Class Members' identities, use Class Members' names to obtain medical services, use Class Members' identities to obtain government benefits, file fraudulent tax returns using Class Members' information, obtain driver's licenses in Class Members' names (but with another person's photograph), and give false information to police during an arrest.

14.     Plaintiff and Class Members will likely suffer additional financial costs for purchasing necessary credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

15.     Plaintiff and Class Members have suffered—and will continue to suffer—from the loss of the benefit of their bargain, unexpected out-of-pocket expenses, lost or diminished value of their Private Information, emotional distress, and the value of their time reasonably incurred to mitigate the fallout of the Data Breach.

16.     Through this action, Plaintiff seeks to remedy these injuries on behalf of themselves and all similarly situated individuals whose Private Information were exfiltrated and compromised in the Data Breach.

17.     Plaintiff seeks remedies including, but not limited to, compensatory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and injunctive relief—including improvements to Defendant' data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

## **PARTIES**

18.     Plaintiff Santisha Bryant-Booker is a natural person and resident and citizen of Racine County, Wisconsin.

19.     Defendant Snowflake, Inc. is a Delaware corporation with its headquarters and principal place of business located at 106 E. Babcock, Suite 3A Bozeman, MT 59715.

20.     Snowflake is a publicly traded corporation listed on the New York Stock Exchange with revenues totaling approximately $829 million for the three months ended on April 30, 2024.[3]

---

[3] Form 10-Q Quarterly Report for Snowflake, Inc., BAMSEC, https://www.bamsec.com/filing/164014724000135?cik=1640147 (last visited July 20, 2024).

21.     Snowflake's Data Cloud platform is used globally, with 9,347 institutions trusting Snowflake to manage and store customers' data.[4]

22.     Due to the nature of the services it provides, Snowflake regularly receives and is entrusted with securely storing its customers' highly sensitive information, including the Plaintiff's and Class Members' Private Information.  As a contracting party entrusted with information like this, Snowflake was expected to provide confidentiality and adequate security for the data it collected in accordance with its promises to its own corporate clients, as well as its corporate clients' promises and disclosures to Plaintiff and Class Members. Snowflake is also expected to comply with statutory privacy requirements and industry standards for safeguarding highly sensitive information.

## JURISDICTION AND VENUE

23.     This Court has original subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Minimal diversity is established because Plaintiff (and many members of the class) are citizens of states different than that of Snowflake.

24.     This Court has general personal jurisdiction over Snowflake because Snowflake's headquarters and principal place of business is located in Bozeman, Montana.

---

[4] *Form 10-K Annual Report for Snowflake, Inc*., BAMSEC,
https://www.bamsec.com/filing/164014724000101?cik=1640147 (last visited July 20, 2024).

This Court also has specific personal jurisdiction over Snowflake because Plaintiff's claims arise out of or relate to Snowflake's conduct in the forum.

25.     Venue is proper in this district because Snowflake's principal place of business is located in this District and the acts or omissions giving rise to Plaintiffs' claims emanated from this District.

26.     This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this district.

27.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because substantial part of the events giving rise to the claims emanated from activities within this District, and Defendant maintains its principal place of business in this District.

## FACTUAL ALLEGATIONS

*The Data Breach*

28.     Beginning in mid-April 2024, a cybercriminal threat actor group known as "ShinyHunters" began a series of attacks aiming to gain entry into Snowflake's systems. The attacks ultimately allowed threat actors to access and exfiltrate data housed on Snowflake's systems by at least 165 corporate clients of Snowflake.  The tremendous amount of exfiltrated data included highly sensitive Private Information relating to hundreds of millions of consumers and employees across the United States.  Snowflake's failure to implement reasonable security measures resulted in the exfiltration of Private Information stored on its systems by, among others, the entities listed below.

29.    **Ticketmaster.**  On May 20, 2024, Live Nation Entertainment Inc. ("Live Nation") identified unauthorized access of its data housed in Snowflake's systems. This breach exposed the Private Information of over 560 million users of Ticketmaster, a subsidiary of Live Nation. The stolen information reportedly contained 1.3 terabytes of data, including customers' full details such as names, home and email addresses, and phone numbers), as well as ticket sales, order, and event information for 560 million customers. Just one week later, threat actors began offering the Private Information for sale via the dark web.

30.    **Advance Auto Parts**. On May 23, 2024, Advance Auto Parts, Inc. ("Advance") identified unauthorized access of its data it was housing in Snowflake's systems. After further investigation, Advance announced that stolen Private Information included "personal information for current and former employees [including full names and email addresses] and job applicants, including social security numbers and other government identification numbers." The stolen Private Information was reported to also include email addresses and names. On June 4, 2024, a hacker going by the name "Sp1d3r" confirmed that they had stolen three terabytes of data from Snowflake, which includes "380M customer profiles (name, email, mobile, phone, address, more), 140M customer orders, 44M Loyalty / Gas card numbers (with customer details), 358k Employees, auto parts / parts numbers, sales history, employment candidate info with SSNs, drivers license

numbers, demographic details, transaction tender details, over 200 tables of data!" This information was also made available for purchase on the dark web.[5]

31.    **Neiman Marcus.**  On May 24, 2024, The Neiman Marcus Group LLC discovered that between April and May 2024, personal data it was storing in Snowflake's systems was also stolen. This breach exposed sensitive Private Information of more than 31 million Neiman Marcus customers and employees, including their names, contact information (e.g., email and postal addresses, and phone numbers), dates of birth, gift card information, transaction data, partial credit card (without expiration dates or CVVs) and social security numbers, and employee identification numbers. The Private Information was also offered for purchase on the dark web by a threat actor using the handle "Sp1d3r."[6]

32.    **Lending Tree.** Lending Tree also confirmed its subsidiary QuoteWizard had data stolen that was housed within Snowflake's systems. On June 1, 2024, a hacker going by the name "Sp1d3r" confirmed that they had stolen sensitive Private Information of over 190 million people from QuoteWizard, which Private Information included "Full customer details, partial CC details (only middle 5 numbers masked), auto history, driving records, personal background information needed for insurance quotes, 3 billion tracking pixels

---

[5] Lawrence Abrams, *Advance Auto Parts confirms data breach exposed employee information*, BLEEPING COMPUTER (June 19, 2024), https://www.bleepingcomputer.com/news/security/advance-auto-parts-confirms-data-breach-exposed-employee-information/ (last accessed July 20, 2024).

[6] Sergiu Gatlan, Neiman Marcus data breach: 31 million email addresses found exposed, BLEEPING COMPUTER (July 8, 2024). https://www.bleepingcomputer.com/news/security/neiman-marcus-data-breach-31-million-email-addresses-found-exposed/ (last accessed July 20, 2024).

from (contains PII, and IP/online tracking details)." This Private Information, as well, was made available for purchase on the dark web.[7]

33.    **AT&T.** AT&T Inc. ("AT&T") recently disclosed that it learned on April 19, 2024, that between April 14 and April 25, 2024, a threat actor accessed and copied AT&T call logs of nearly all AT&T's wireless customers.  The call logs pertain to customer call and text interactions occurring between May 1 and October 31, 2022 and on January 2, 2023, and include metadata revealing: phone numbers, call counts, aggregate call duration for a day or month and, for a subset of records, one or more cell site identification numbers. AT&T also admitted that publicly available online tools can provide customers' names associated with their telephone numbers.[8] An AT&T spokesperson acknowledged that the stolen data was also housed in Snowflake's systems and confirmed that it intends to notify around 110 million customers of this breach.[9]

34.    A joint investigation conducted by Mandiant and Snowflake revealed that the threat actors gained access to Private Information in Snowflake's possession by using Snowflake's customers' compromised credentials, advertising victim data for sale on cybercrime forums, and attempting to extort many of the victims.[10] Specifically, some

---

[7] Jonathan Greig, LendingTree confirms that cloud services attack potentially affected subsidiary, The Record (June 10, 2024). https://therecord.media/lendingtree-quotewizard-cybersecurity-incident-snowflake (last accessed July 20, 2024).

[8] AT&T Inc., Form 8-K (July 12, 2024). https://www.sec.gov/ix?doc=/Archives/edgar/data/0000732717/000073271724000046/t-20240506.htm (last accessed July 20, 2024).

[9] Zack Whittaker, *AT&T says criminals stole phone records of 'nearly all' customers in new data breach*, Tech Crunch (July 12, 2024), https://techcrunch.com/2024/07/12/att-phone-records-stolen-data-breach/ (last accessed July 20, 2024).

[10] UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion, MANDIANT (June 10, 2024), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion. (last accessed July 20, 2024)

customers' credentials were previously stolen via infostealer malware, which credentials were then used to access customer Snowflake data and exfiltrate the Private Information. Importantly, the threat actor targeted accounts that did not have MFA enabled. Several of the stolen customer credentials were dated as far back as 2020.[11]

35.    The joint investigation summarized the attack against Snowflake was so successful primarily because: 1) "the impacted accounts were not configured with multi-factor authentication enabled, meaning successful authentication only required a valid username and password"; 2) stolen customer credentials "were still valid, in some cases years after they were stolen, and had not been rotated or updated"; and 3) the "impacted Snowflake customer instances did not have network allow lists in place to only allow access from trusted locations."[12]

36.    Snowflake's own chief information security officer, Brad Jones, described the Data Breach as a "targeted campaign directed at users with single-factor authentication."[13] The use of MFA is a readily available and commonly used cyber security measure, and most software as a service vendors allow administrators to enforce MFA. This is common behavior, as users are used to from their Office 365 or Google Workspace environments and other enterprise applications, such as Salesforce and Slack.[14]

---

[11] *Id.*

[12] *Id.*

[13] Whittaker, n.9, *supra*.

[14] Solomon Klappholz, With hundreds of Snowflake credentials published on the dark web, it's time for enterprises to get MFA in order, IT Pro (June 7, 2024), https://www.itpro.com/security/cyber-attacks/with-hundreds-of-snowflake-credentials-published-on-the-dark-web-its-time-for-enterprises-to-get-mfa-in-order (last accessed July 20, 2024)

37.     Thus, Snowflake could—and should—have prevented the Data Breach by requiring its clients to utilize MFA to safeguard Plaintiff's and Class Members' Private Information.  Snowflake does not even enable MFA for its clients by default, nor does Snowflake allow its use to be enforced on users by the administrator of its clients.

38.     Use of MFA to safeguard accounts is common practice and would have prevented client account credentials from being used to gain unauthorized entry to Snowflake's systems.  While Snowflake now claims it is "developing a plan to require our customers to implement advanced security controls, like multifactor authentication (MFA) or network policies, especially for privileged Snowflake customer accounts," such efforts are too little, and too late.[15]

39.     Snowflake itself reportedly failed to use MFA for its own users, with the company stating that a former employee's 'demo' account had been compromised because it was only protected by a username and password.

40.     Snowflake's failure to implement MFA protocols is particularly surprising given that just last year, in a high-profile data breach, cybercriminals scraped approximately 6.9 million user and genetic records from 23andMe accounts that were not protected by MFA.  Following that breach, 23andMe required the use of MFA on all user accounts.

41.     In addition to its failure to adequately employ MFA to safeguard Plaintiff's and Class Members' Private Information, Snowflake also could have—and should have—

---

[15] Whittaker, n.9, *supra.*

prevented the Data Breach by requiring all clients to regularly update their account credentials, especially account credentials that have not been updated for years, and monitored the dark web and popular infostealer marketplaces for compromised credentials. Snowflake also could have—and should have—enforced network "allow lists" in place to only allow access from trusted locations and otherwise enacted policies to more effectively detect and prevent unusual or unauthorized activity.

42.    In sum, upon information and belief, Defendant enabled malicious threat actors to exfiltrate Plaintiff's and Class Member's Private Information, causing Plaintiff and Class Member's immediate harm and leaving Plaintiff and Class Members at risk of further harm through dissemination and use by other unauthorized bad actors.

***Plaintiff's and Class Member's Harms***

43.    Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.5% of U.S.-based workers are compensated on an hourly basis, while the other 44.5% are salaried.[16]

44.    According to the U.S. Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per

---

[16] *Characteristics of minimum wage workers, 2020*, U.S. BUREAU OF LABOR STATISTICS https://www.bls.gov/opub/reports/minimum-wage/2020/home.htm#:~:text=%20In%202020%2C%2073.3%20million%20workers,wage%20of%20%247.25%20per%20hour (last accessed March 18, 2024); *Average Weekly Wage Data*, U.S. BUREAU OF LABOR STATISTICS, *Average Weekly Wage Data, https://www.bls.gov/news.release/pdf/wkyeng.pdf* (last accessed March 18, 2024) (finding that on average, private-sector workers make $1,145 per 40-hour work week.).

week;[17] leisure time is defined as time not occupied with work or chores and is "the time equivalent of 'disposable income.'"[18] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

45.    Plaintiff and Class Members are now deprived of the choice as to how to spend their valuable free hours and seek renumeration for the loss of valuable time as another element of damages.

46.    Upon information and belief, the unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' Private Information with the intent of engaging in misuse of the Private Information, including marketing and selling Plaintiff's and Class Members' Private Information.

47.    To date, Snowflake has not offered anything to protect Plaintiff and Class Members from the lifetime risks they each now face. As another element of damages, Plaintiff and Class Members seek a sum of money sufficient to provide Plaintiff and Class Members identity theft protection services for their respective lifetimes.

48.    Snowflake had and continues to have obligations created by reasonable industry standards, common law, state statutory law, and its own assurances and

---

[17]  Cory Stieg, *You're spending your free time wrong — here's what to do to be happier and more successful*, CNBC https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html (Nov. 6, 2019) (last accessed March 18, 2024).
[18] *Id.*

representations to keep Plaintiff's and Class Members' Private Information confidential and to protect such Private Information from unauthorized access.

49.    Plaintiff and the Class Members remain, even today, in the dark regarding the scope of the data breach and what particular data was stolen, beyond the categories listed as "included" in letters they have received from certain of Snowflake's corporate clients. Moreover, Plaintiff and the Class Members are unaware as to what steps are being taken, if any, to secure their Private Information and financial information going forward. Plaintiff and Class Members are left to speculate as to the full impact of the Data Breach and how exactly Snowflake intends to enhance their information security systems and monitoring capabilities so as to prevent further breaches.

50.    Even more of the Plaintiff's and Class Members' Private Information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and/or Class Members. Either way, unauthorized individuals can now easily access the Private Information, including Private Information and/or financial information, of Plaintiff and Class Members.

***Defendant Failed to Comply with FTC Guidelines***

51.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[19] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as

---

[19] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (June 2015), https://bit.ly/3uSoYWF (last accessed March 18, 2024).

Snowflake, should employ to protect against the unlawful exfiltration of Private Information.

52.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[20] The guidelines explain that businesses should:

      a.     protect the personal customer information that they keep;

      b.     properly dispose of personal information that is no longer needed;

      c.     encrypt information stored on computer networks;

      d.     understand their network's vulnerabilities; and

      e.     implement policies to correct security problems.

53.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

54.     The FTC recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[21]

---

[20] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://bit.ly/3u9mzre (last accessed March 18, 2024).
[21] *See Start With Security, A Guide for Business*, FED. TRADE COMMISSION, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited March 16, 2024).

55.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

56.    Snowflake's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

57.    Despite its alleged commitments to securing sensitive data, Snowflake does not follow industry standard practices in securing Private Information.

58.    Experts studying cyber security routinely identify financial service providers as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

59.    Several best practices have been identified that at a minimum should be implemented by financial service providers like Snowflake, including but not limited to, educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

60.    Other best cybersecurity practices that are standard in the financial service industry include installing appropriate malware detection software; monitoring and

limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

61.     Snowflake failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

62.     Such frameworks are the existing and applicable industry standards in the financial service industry. Snowflake failed to comply with these accepted standards, thus opening the door to criminals and the Data Breach.

### *The Experiences and Injuries of Plaintiff and Class Members*

63.     Plaintiff is a former customer of AT&T, having ended her relationship with AT&T no later than 2021.  Class Members are current or former customers of AT&T and other companies that used Snowflake's services.

64.     As a prerequisite of using its services, AT&T, and other companies that used Snowflake's services, require its customers' customers—like Plaintiff and Class Members—to disclose their Private Information.

65.    Because of the Data Breach, Snowflake inflicted injuries upon Plaintiff and Class Members. And yet, Snowflake has done little to provide Plaintiff and the Class Members with relief for the damages they suffered.

66.    All Class Members were injured when Snowflake caused their Private Information to be exfiltrated by cybercriminals.

67.    Plaintiff and Class Members entrusted their Private Information to Defendant. Thus, Plaintiff had the reasonable expectation and understanding that Snowflake would take—*at minimum*—industry standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify them of any data security incidents. Plaintiff had reasonable expectation and understanding that Defendant Snowflake would exercise reasonable care in selecting its data storage services provider.  After all, Plaintiff would not have entrusted their Private Information to Defendant had they known that Snowflake would not take reasonable steps to safeguard their information.

68.    As a result of the Data Breach, Plaintiff experienced fraudulent charges on her credit cards, which she discovered while perusing her credit card statements.  She was able to successfully dispute these charges, but was forced to close her credit card accounts and open new ones, to prevent such fraud from happening in the future.  This process was stressful and time consuming.  In addition, she was charged late fees as a result of this process.  Further, some of the unauthorized charges were sent to collection agencies, which took additional time to dispute.

69.     Plaintiff and Class Members suffered actual injury from having their Private Information compromised in the Data Breach including, but not limited to, (a) damage to and diminution in the value of their Private Information—a form of property that Snowflake obtained from Plaintiff; (b) violation of their privacy rights; (c) the likely theft of their Private Information; (d) fraudulent activity resulting from the Breach; and (e) present and continuing injury arising from the increased risk of additional identity theft and fraud.

70.     As a result of the Data Breach, Plaintiff and Class Members also suffered emotional distress because of the release of their Private Information—which they believed would be protected from unauthorized access and disclosure. Now, Plaintiff and Class Members suffer from anxiety about unauthorized parties viewing, selling, and/or using their Private Information for nefarious purposes like identity theft and fraud.

71.     Plaintiff and Class Members also suffer anxiety about unauthorized parties viewing, using, and/or publishing their information related to their medical records and prescriptions.

72.     Because of the Data Breach, Plaintiff and Class Members have spent—and will continue to spend—considerable time and money to try to mitigate and address harms caused by the Data Breach.

***Plaintiff and the Proposed Class Face Significant Risk of Present and Continuing Identity Theft***

73.     Plaintiff and Class Members suffered injury from the misuse of their Private Information that can be directly traced to Defendant.

74.    The ramifications of Snowflake's failure to keep Plaintiff's and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

75.    According to experts, one out of four data breach notification recipients become a victim of identity fraud.[22]

76.    As a result of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiff and Class Members suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

    a.    The loss of the opportunity to control how their Private Information is used;

    b.    The diminution in value of their Private Information;

    c.    The compromise and continuing publication of their Private Information;

    d.    Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

---

[22]Anne Saita, "Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims", Threat Post, (Feb. 20, 2013) https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/ (last visited on March 18, 2024).

e.      Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.      Delay in receipt of tax refund monies;

g.      Unauthorized use of stolen Private Information; and

h.      The continued risk to their Private Information, which remains in the possession of Snowflake and is subject to further breaches so long as Snowflake fails to undertake the appropriate measures to protect the Private Information in their possession.

77.     Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen Private Information can be worth up to $1,000.00 depending on the type of information obtained.[23]

78.     The value of Plaintiff's and the proposed Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years, and criminals frequently post stolen Private Information openly and directly on

---

[23] Brian Stack, "Here's How Much Your Personal Information Is Selling for on the Dark Web," EXPERIAN (Dec. 6, 2017) https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited on March 18, 2024).

various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

79.    It can take victims years to spot or identify Private Information theft, giving criminals plenty of time to milk that information for cash.

80.    One such example of criminals using Private Information for profit is the development of "Fullz" packages.[24]

81.    Cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

82.    The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-

---

[24] "Fullz" is fraudster-speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, "Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm," KREBS ON SECURITY, (Sep. 18, 2014) https://krebsonsecurity.com/tag/fullz/ (last visited on March 18, 2024).

criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

83.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

84.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant did not rapidly report to Plaintiff and the Class that their Private Information had been stolen.

85.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

86.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in

their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

87.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

88.     FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[25]

89.     The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[26] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on

---

[25] "Commissioner Pamela Jones Harbour: Remarks Before FTC Exploring Privacy Roundtable," FED. TRADE COMMISSION (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited on March 18, 2024).
[26] "Start With Security, A Guide for Business," FED. TRADE COMMISSION, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited March 18, 2024).

networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[27]

90.    According to the FTC, unauthorized Private Information disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money, and patience to resolve the fallout.[28] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act (the "FTCA").

91.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. See *In the matter of Lookout Services, Inc.*, No. C-4326, Complaint ⁋ 7 (June 15, 2011) ("[Respondent] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ⁋ 7 (Mar. 7, 2006) ("[Respondent] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require

---

[27] *Id.*

[28] "Taking Charge, What to Do If Your Identity is Stolen," U.S. DEPARTMENT OF JUSTICE, at 3 (January 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited on March 18, 2024).

network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Respondent] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . .").

92.    These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations. Snowflake thus knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of Private Information.

93.    Charged with handling highly sensitive Private Information including, financial information, and insurance information, Defendant knew or should have known the importance of safeguarding the Private Information that was entrusted to it. Defendant also knew or should have known of the foreseeable consequences if their data security systems were breached. This includes the significant costs that would be imposed on Defendant's customers as a result of a breach. Snowflake nevertheless failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

94.    Snowflake's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy (like MFA), demonstrates a willful and conscious disregard for privacy, and Snowflake has failed to adequately protect the Private

Information of Plaintiff and potentially thousands of members of the proposed Class to unscrupulous operators, con artists, and outright criminals.

95.    Snowflake's failure to properly notify Plaintiff and members of the proposed Class of the Data Breach exacerbated Plaintiff's and members of the proposed Class's injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

## CLASS ACTION ALLEGATIONS

96.    Plaintiff brings this action individually and on behalf of all other persons similarly situated ("the Class") under Fed. R. Civ. P. 23(b)(2), 23(b)(3), and 23(c)(4).

97.    Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> All persons or entities residing in the United States whose PII was impacted by the Data Breach suffered by Snowflake Inc. and its affiliated entities, that was announced on or about May 23, 2024. (the "Class").

98.    The Class defined above is readily ascertainable from information in Defendant's possession. Thus, such identification of Class Members will be reliable and administratively feasible.

99.    Excluded from the Class are: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or their parent has a controlling interest, and their current or former officers and directors; (3)

persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; (6) members of the jury; and (7) the legal representatives, successors, and assigns of any such excluded persons.

100.    Plaintiff reserves the right to amend or modify the Class definition—including potential Subclasses—as this case progresses.

101.    Plaintiff and Class Members satisfy the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

102.    **Numerosity**. The Class Members are numerous such that joinder is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of tens of thousands of individuals who were customers of one or more of Defendant Snowflake's corporate clients, or one of its member companies, and whose Private Information was compromised by Snowflake's Data Breach.

103.    **Commonality**. There are many questions of law and fact common to the Class. And these common questions predominate over any individualized questions of individual Class Members. These common questions of law and fact include, without limitation:

    a.    If Snowflake unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b.  If Snowflake failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.  If Snowflake's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.  If Snowflake's data security systems prior to and during the Data Breach were consistent with industry standards;

e.  If Snowflake owed a duty to Class Members to safeguard their Private Information;

f.  If Snowflake breached its duty to Class Members to safeguard their Private Information;

g.  If Snowflake knew or should have known that its data security systems and monitoring processes were deficient;

h.  If Snowflake should have discovered the Data Breach earlier;

i.  If Snowflake took reasonable measures to determine the extent of the Data Breach after it was discovered;

j.  If Snowflake's delay in informing Plaintiff and Class Members of the Data Breach was unreasonable;

k.  If Snowflake's method of informing Plaintiff and Class Members of the Data Breach was unreasonable;

l.  If Snowflake's conduct was negligent;

m.   If Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

n.   If Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant' misconduct;

o.   If Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

p.   If Snowflake failed to provide notice of the Data Breach in a timely manner; and

q.   If Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

104.   **Typicality**. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach. Moreover, Plaintiff and Class Members were subjected to Defendant's uniformly illegal and impermissible conduct.

105.   **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating complex class actions. Plaintiff has no interests that conflict with, or are antagonistic to, those of the Class.

106.   **Predominance**. Defendant have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff and Class Members' data was stored on the same network system and unlawfully and inadequately protected in the same

way. The common issues arising from Defendant' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

107.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class Member.

108.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

109.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

110.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of

which would advance the disposition of this matter and the parties' interests therein. Such particular issues include those set forth above, including in paragraph 103.

111. Defendant have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

112. Plaintiff re-alleges and incorporates by reference paragraphs 1-111 of the Complaint as if fully set forth herein.

113. Snowflake required its corporate clients to submit Private Information of their customers, Plaintiff's and Class Members', to Snowflake to receive Snowflake's services.

114. By collecting and storing this data in its computer system and network, sharing it and using it for commercial gain, Snowflake owed Plaintiff and Class Members a duty of care to use reasonable means to secure and safeguard its computer system—and Plaintiff's and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Snowflake's duty included a responsibility to implement processes so they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

115. The risk that unauthorized persons would attempt to gain access to the Private Information and misuse it was foreseeable to both Snowflake. Given that

Snowflake holds vast amounts of Private Information, it was inevitable that unauthorized individuals would at some point try to access Snowflake's databases of Private Information.

116.    After all, Private Information is highly valuable, and Snowflake knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Private Information of Plaintiff and Class Members. Thus, Snowflake knew, or should have known, the importance of exercising reasonable care in handling the Private Information entrusted to them.

117.    Snowflake owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their, or their service providers', systems and networks, and the personnel responsible for them, adequately protected the Private Information.

118.    Snowflake's duty of care to use reasonable security measures arose because of the special relationship that existed between Snowflake and Plaintiff and Class Members, which is recognized by laws and regulations, as well as common law. Snowflake was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

119.    Snowflake failed to take appropriate measures to protect the Private Information of Plaintiff and the Class. Snowflake is morally culpable, given the prominence of security breaches in the financial services industry, including the insurance industry. Any purported safeguards that Snowflake had in place were wholly inadequate, particularly in the absence of MFA.

120.    Snowflake breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class members' Private Information by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite known data breaches in the financial service industry, and allowing unauthorized access to Plaintiff's and the other Class Members' Private Information.

121.    Snowflake was negligent in failing to comply with industry and federal regulations in respect of safeguarding and protecting Plaintiff's and Class Members' Private Information.

122.    But for Snowflake's wrongful and negligent breach of its duties to Plaintiff and Class Members, Plaintiff's and Class Members' Private Information would not have been compromised, stolen, and viewed by unauthorized persons. Snowflake's negligence was a direct and legal cause of the theft of the Private Information of Plaintiff and the Classes and all resulting damages.

123.    Snowflake owed Plaintiff and Class Members a duty to notify them within a reasonable time frame of any breach to their Private Information. Snowflake also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is necessary for Plaintiff and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of the Data Breach.

124.    Snowflake owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals who

Snowflake knew or should have known would suffer injury-in-fact from its inadequate security protocols. After all, Snowflake actively sought and obtained the Private Information of Plaintiff and Class Members through its corporate clients, to whom Plaintiff and Class Members provided their Private Information.

125.    Snowflake breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information.  In addition, The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.    Failing to comply with—and thus violating—FTCA and its regulations;

c.    Failing to adequately monitor the security of its networks and systems;

d.    Failing to have in place mitigation policies and procedures;

e.    Allowing unauthorized access to Plaintiff's and Class Members' Private Information;

f.    Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

126.    It was foreseeable that Snowflake's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial service industry. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

127.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Snowflake's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the other Class Members' Private Information. Snowflake knew or should have known that their systems and technologies for processing and securing the Private Information of Plaintiff and Class Members had security vulnerabilities.

128.    As a result of Snowflake's negligence, the Private Information of Plaintiff and Class Members was compromised, placing them at a greater risk of identity theft and their Private Information being disclosed to third parties without the consent of Plaintiff and the Class Members.

129.    Simply put, Snowflake's negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injuries-in-fact and damages. These injuries include, but are not limited to, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects

of the Data Breach that resulted from and were caused by Snowflake's negligence. Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

130.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

**SECOND CAUSE OF ACTION**
**Negligence *Per Se***
**(On Behalf of Plaintiff and the Class)**

131.    Plaintiff re-alleges and incorporates by reference paragraphs 1-111 of the Complaint as if fully set forth herein.

132.    Under the Federal Trade Commission Act, Defendant had a duty to employ reasonable security measures. Specifically, this statute prohibits "unfair . . . practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data.[29]

133.    Moreover, Plaintiff's and Class Members' injuries are precisely the type of injuries that the FTCA guards against. After all, the FTC has pursued numerous enforcement actions against businesses that—because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices—caused the very same injuries that Snowflake inflicted upon Plaintiff and Class Members.

134.    Snowflake's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Snowflake is bound by industry standards to protect confidential Private Information.

---

[29] 15 U.S.C. § 45.

135.    Snowflake's failure to comply with FTCA statutory duties and standards of conduct constitutes negligence *per se*.  Snowflake's failure to comply with the requisite standard of care caused the Breach, exposing Plaintiff's and Class Members' Private Information to cyber criminals and causing Plaintiff and Class Members pecuniary and non-pecuniary harm detailed herein.

136.    Plaintiff and Class Members are also entitled to injunctive relief requiring Snowflake to: (1) strengthen their data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) continue to provide adequate credit monitoring to all Class Members for the remainders of their lives. This list is non-exhaustive and Plaintiff will further move for injunctive relief in support of a Rule 23(b)(2) class.

## THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

137.    Plaintiff re-alleges and incorporates by reference paragraphs 1-111 of the Complaint as if fully set forth herein.

138.    Plaintiff and Class Members conferred a monetary benefit on Snowflake, by paying money for AT&T's and other Snowflake's clients' services, a portion of which was passed on by AT&T and Snowflake's other corporate clients to Snowflake, and was intended to have been used by Snowflake for data security measures to secure Plaintiff's and Class Members' Private Information. Plaintiff and Class Members further conferred a benefit on Snowflake in the form of their Private Information from which Snowflake derived profits.

139.    Snowflake enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Snowflake instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Snowflake's failure to provide adequate security.

140.    Under the principles of equity and good conscience, Snowflake should not be permitted to retain the money belonging to Plaintiff and Class Members, because Snowflake failed to implement appropriate data management and security measures that are mandated by industry standards.

141.    Snowflake acquired the monetary benefit, Private Information, through inequitable means in that Snowflake failed to disclose its inadequate security practices, previously alleged, and failed to maintain adequate data security.

142.    If Plaintiff and Class Members knew that Snowflake had not secured their Private Information, they would not have agreed to give their money—or disclosed their Personal Information—to AT&T and other Snowflake clients, and would have forbidden AT&T and other Snowflake clients from disclosing their Personal Information to Snowflake.

143.    Plaintiff and Class Members have no adequate remedy at law.

144.    As a direct and proximate result of Snowflake's conduct, Plaintiff and Class Members have suffered—and will continue to suffer—a host of injuries, including but not

limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their Private Information is used; (3) the compromise, publication, and/or theft of their Private Information; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their Private Information, which remain in Defendant' possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in their possession; and (7) future expenditures of time, effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of the Data Breach.

145.    As a direct and proximate result of Defendant' conduct, Plaintiff and Class Members suffered—and will continue to suffer—other forms of injury and/or harm.

146.    Snowflake should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from Plaintiff and Class Members.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, requests the following relief:

A.    An Order certifying this action as a class action and appointing Plaintiff as Class representative, and the undersigned as Class Counsel;

B. A mandatory injunction directing Snowflake to adequately safeguard the Private Information of Plaintiff and the Class hereinafter by implementing improved security procedures and measures, including but not limited to an Order:

    i. prohibiting Snowflake from engaging in the wrongful and unlawful acts described herein;

    ii. requiring Snowflake to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii. requiring Snowflake to delete and purge the Private Information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv. requiring Snowflake to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' Private Information;

    v. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant' systems on a periodic basis;

vi.    prohibiting Snowflake from maintaining Plaintiff's and Class Members' Private Information on a cloud-based database until proper safeguards and processes are implemented;

vii.   requiring Snowflake to segment data by creating firewalls and access controls so that, if one area of Defendant' network is compromised, hackers cannot gain access to other portions of Snowflake's systems;

viii.  requiring Snowflake to conduct regular database scanning and securing checks;

ix.    requiring Snowflake to monitor ingress and egress of all network traffic;

x.     requiring Snowflake to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiff and Class Members;

xi.    requiring Snowflake to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Snowflake's policies, programs, and systems for protecting personal identifying

44

information; and

xii.  requiring Snowflake to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Snowflake's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated.

C.  A mandatory injunction requiring that Snowflake provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of Private Information to unauthorized persons;

D.  An injunction enjoining Snowflake from further deceptive practices and making untrue statements about the Data Breach and the stolen Private Information;

E.  An award of damages, including actual, nominal, consequential damages, and punitive, as allowed by law in an amount to be determined;

F.  An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.  An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law;

H.  Granting the Plaintiff and the Class leave to amend this Complaint to conform to the evidence produced at trial;

I.  For all other Orders, findings, and determinations identified and sought in this Complaint; and

J.  Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury for any and all issues in this action so triable as of right.

Dated: July 24, 2024                    Respectfully Submitted,

/s/ *David R. Paoli*
**PAOLI LAW FIRM**
David R. Paoli
davidpaoli@paoli-law.com
257 W. Front St., Suite A
Missoula, Montana 59802
T: (406) 542-3330
F: (406) 542-3332

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
Jean S. Martin*
jeanmartin@forthepeople.com
Ryan J. McGee*
rmcgee@forthepeople.com
Ronald Podolny*
ronald.podolny@forthepeople.com
201 North Franklin Street 7th Floor
Tampa, Florida 33602
T: (813) 223-5505
F: (813) 223-5402

*Pro hac vice forthcoming*

**Counsel for Plaintiff and the Class**